UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA, UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA, LOCAL 610, MICHAEL MURPHY, JAMES CAPPETTA, AND EDWARD KRISTOFIK, PLAINTIFFS *v.* ELIZABETH DOLE, SECRETARY OF LABOR, U.S. DEPARTMENT OF LABOR, DEFENDANT

Court No. 86-11-01409

(Decided December 13, 1990)

*United Elec., Radio and Mach. Workers of America, (Robin Alexander), Neighborhood Legal Services Ass'n, (John Stember)* for the plaintiffs.
*Stuart M. Gerson,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, *(Velta A. Melnbrencis), Gary Bernstecker,* U.S. Department of Labor, of counsel, for the defendant.

## MEMORANDUM AND ORDER

RESTANI, *Judge:* Defendant has now submitted its third determination to the court.[1] Plaintiffs, former employees of the Swissvale, Pennsylvania plant of Union Switch and Signal ("Company" or "Union Switch"), a company producing railway systems, claim that they lost their jobs because the Company substituted foreign imports for products formerly produced at Swissvale.[2] Initially, the Department of Labor ("Labor" or "Secretary") denied certification of any Swissvale workers. Labor, on redetermination after finding that it had conducted an inadequate investigation, certified three sections of the plant, comprising section 110 (sheet metal fabrication), section 390 (dipping of sheet metal to prevent rusting), and section 222 (part of Unit Shop II that wired office control panels). The certification included sixty (60) of approximately five hundred (500) workers.

Petitioners objected to the determination, claiming that the Company had previously supplied false and misleading information to Labor, and that imported Canadian panels adversely affected employment throughout the plant. Moreover, plaintiffs claimed that other imports,

---

[1] For a more detailed history of this case, *see United Elec., Radio & Mach. Workers of Am. v. United States,* 11 CIT 590, 669 F. Supp. 467 (1987) (*United Electrical I*) and *United Elec., Radio & Mach. Workers of Am. v. Brock,* 14 CIT 121, 731 F. Supp. 1082 (1990) (*United Electrical II*).

[2] Following a bitter strike, separations began in 1983 and continued until the plant shut down in 1987.

such as Korean relay frames and Italian train-stop kits, caused layoffs. The court sustained the findings with respect to Korean relay frames but remanded the case once more for further investigation of the other two items. *See United Electrical II*. The results of that remand, which the court will refer to as the "third remand investigation," are the subject of this opinion.

## I. FACTS

On March 28, 1990, during the third investigation, Labor obtained a sworn affidavit executed by V. John Poremba. Supplemental Administrative Record (Supp. Ad. R.) at 8-12. The affiant stated that he had been Vice President of Manufacturing at Union Switch for more than ten years until his retirement approximately four years ago, some months prior to the end of the investigatory period. As Vice President, he had been responsible for all Company plants, including plants in Pennsylvania, South Carolina, Georgia, and Ireland. Supp. Ad. R. at 8. The Swissvale plant produced train control systems and equipment. The systems consisted of control panels and relays which were arranged according to engineering specifications. According to Mr. Poremba the engineering content contributed between 15 percent and 30 percent of the total work. The higher percentage engineering content involved totally new systems designs. Supp. Ad. R. 8-9.

Mr. Poremba stated that he had examined the process sheet and the bill of materials included in the administrative record at pp. A-29, A-43 and A-44[3], and believed them to represent the type and size of panels produced at Swissvale. The larger panels, of which Swissvale produced between four to six per year, were associated with control systems with a total value that far exceeded the typical panel referred to in the earlier administrative records. The discrepancy in value was due to the heavy engineering content and the value of the wiring and equipment in the control panel. According to the affidavit, even in the case of the one control panel imported from Canada that he recalled, all of the wiring and equipment was added at Swissvale. Moreover, the bulk of the components listed on pp. A-43 and A-44, which completion of the panel required, would have been supplied from Swissvale even if the Company had purchased the panel from outside sources. Supp. Ad. R. at 9-10.

With regard to the purchase order for the Italian train-stop kit at C-133[4], Mr. Poremba stated that to the best of his recollection, this purchase involved engineering and technology different from that employed at Swissvale. Supp. Ad. R. at 10-11.

In a sworn statement dated April 2, 1990, Andrew J. Carey, Director of Transit Engineering and Michael L. Grossman, Director of Transit Projects, confirmed the following information regarding the Company's

---

[3] The prefix "A-" refers the administrative record compiled during the first remand investigation.

[4] The prefix "C-" refers to the administrative record compiled during the second remand investigation.

supply of an Automatic Train Stop System as part of Contract Number CY-111 with the Port Authority of Allegheny County (PAC):

1. The Technical Specification for Contract CY-111 required an "intermittent" train-stop system.

2. Union Switch did not manufacture such a train-stop system.

3. In order to comply with the Technical Specification, Union Switch subcontracted with Compagnia Italiana Segnali (CIS) of Torino, Italy for the supply of the train-stop system. Supp. Ad. R. at 14.

By letter dated April 3, 1990, Mr. Grossman supplied the following additional information regarding the train-stop system provided by Union Switch to PAC under Contract CY-111 (Supp. Ad. R. at 15):

1. The Technical Specification for Contract CY-111 called for an "intermittent" train-stop system, which was the type of system in common use in European countries; Union Switch & Signal's own type of train-stop system was "continuous," which is typically employed by railways and transit authorities in the United States.

2. The CY-111 contract was for a total of approximately $20,000,000, of which the train-stop system represented $1,200,000. Of this $1,200,000, approximately $250,000 was for engineering.

Unable to locate a significant amount of documentary evidence supporting these statements, Labor held a hearing under a protective order on May 23, 1990. Company officials Messrs. Michael Grossman, Andrew J. Carey, V. John Poremba, and Louis D. Kopsa testified pursuant to the Secretary's subpoenas. Petitioners asked to present their own witnesses but Labor denied this request. Labor did not allow petitioners to cross-examine the witnesses.[5]

Subsequent to the hearing, plaintiffs submitted to Labor undated, unsworn statements, captioned affidavits, from Messrs. Bruce Wilson, James Fonzi, John Fabrizi and V. John Poremba. Supp. Ad. R. at 55-60. Mr. Wilson stated that he had been employed at Union Switch for over 35 years and that, between 1980-85, he was the management employee in charge of the Quality Assurance Section (QA), which had responsibility for testing/simulation of systems, including display panels. A test/simulation could take a number of months, involving upwards of 45 employees in two shifts. According to Mr. Wilson, the importation of Canadian panels had a significant effect on employment throughout the plant because the imported panels came with the component parts, which Swissvale had manufactured, already installed and with the wiring complete. The only work remaining to be completed was the wiring together of the already finished panel sections. By importing panels, the Company reduced the workload of the QA section by one third. Mr. Wilson estimated that imports of panels and other components eliminated well over twenty percent of the jobs at Swissvale because departments

---

[5] In *United Electrical II*, the court did not direct Labor to allow petitioners to cross-examine Company witnesses, but said that Labor could allow such cross-examination if it so chose. The court did direct Labor to allow petitioners to submit questions to the hearing examiners for them to propound to the witnesses should they find these questions helpful.

throughout the plant (engineering, drafting, store room, machine shop, engraving, silk screening, fabricating, shipping, receiving, assembly, and testing) were affected by the importation of panels. According to Mr. Wilson, Swissvale had made vital and non-vital relays that were used extensively as component parts in rail control systems, including display panels. By the time Mr. Wilson left Swissvale, the LP-100 non-vital relay, which Swissvale had produced in large quantities, had been replaced by the mid-tex relay, produced in Mexico. Supp. Ad. R. at 56.

Mr. Fonzi stated that he had been employed by Union Switch for 43 years; that he last worked in 1987; that his last position, which he held for over 20 years, was as an inspector in QA; and that he had worked directly on the test/simulation of imported panels. The balance of his statement consisted of allegations identical to those contained in Mr. Wilson's statement. Supp. Ad. R. at 57.

Mr. Fabrizi stated that he had attended the hearing and had heard Mr. Poremba's testimony regarding the imported Canadian panels. Mr. Fabrizi was employed as a wireman and was directly involved in the wiring and testing of both Swissvale-manufactured and imported panels and had personally worked on upwards of twenty imported panels. He stated that the production of a Swissvale-made panel could take as long as a year because all of the components were fully manufactured and installed at Swissvale; the testing/simulation phase alone could take a number of months and involve upwards of 45 employees. The imported panels came with all of the component parts already installed and with the wiring complete. Testing was virtually eliminated. Supp. Ad. R. at 58.

Plaintiffs submitted Mr. Poremba's statement to supplement the affidavit he had previously submitted to Labor. He stated that he had been last actively employed by Union Switch in June of 1985 and had no further involvement with production since that time. A "debate" had taken place in the Company in the early 1980's about whether to retain vertical integration or to outsource feeder operations. The "pro-outsourcing" group prevailed and actively searched for vendors, including foreign producers, who could supply parts and other operations more cheaply. Swissvale had manufactured vital and non-vital relays and used them extensively as component parts in making rail control systems, including display panels. By the time that he left, the Company had largely replaced the non-vital relays with the midtex relays purchased from an outside vendor. Supp. Ad. R. at 59. The bill of materials and process sheet contained in the record was for a single B-30 panel, approximately 19″ x 40″, which could take 2-4 weeks to produce. The Company built B-30 panels to control a small portion of a rail system, whereas rail system operators used a much larger display panel to control an entire system. An entire display panel could be many times larger than a single B-30 panel and could take many months to complete. During production the display panels underwent many types of operations throughout the entire plant, including various operations in the ma-

chine shop. They also underwent rigorous testing/simulation, which could involve numerous employees (especially from QA) on two shifts and could last a number of months. He could personally recall one Canadian panel. The Company, however, may have imported more. Supp. Ad. R. at 59-60.

According to Mr. Poremba, the Macon plant performed essentially distribution and final assembly and did not have the capacity to manufacture train-stops. The Batesburg plant was incapable of manufacturing operations (such as a train-stop kit) because both its equipment and machine shop were limited. Swissvale had the capability, machinery and skill levels to manufacture virtually anything, including train-stop kits or other equipment produced by CIS. Supp. Ad. R. at 60.[6] With regard to other affiants attesting to the negative effect on employment throughout the plant from imported panels, train-stop kits and relay frames, Mr. Poremba stated that Louis Serrepere, James Phelan and Tom Repic were former management employees who had worked under him when he was plant manager. Serrepere was highly knowledgeable about machine shop operations, as was Phelan with regard to Unit Shop II. Mr. Poremba stated that each had more direct day-to-day involvement with those respective areas than he. The Company transferred Mr. Repic to Batesburg after Mr. Poremba's retirement. Jim Fonzi, though not a management employee, was intimately familiar with the testing/simulation operations. He would have also worked on a daily basis with and had knowledge of the mid-tex relay. Mr. Poremba stated that he had reviewed the "affidavits" submitted by Louis Serrepere and James Phelan, and said that "[t]o the extent that I have knowledge of the facts and issues addressed therein, these statements appear to be true and correct to me." Supp. Ad. R. a 60.[7]

## II. DISCUSSION

A. *Procedural Problems of Third Investigation:*

In *United Electrical II*, the court ordered Labor to submit its results on remand by April 30, 1990. This gave Labor a period of sixty days. On April 25, Labor filed a motion for a forty-five day extension. Plaintiffs opposed the motion. By Order of May 4, 1990, the court stated that it did

> not believe that defendant has given sufficient reason for such extension, nor is the court convinced that defendant has given this investigation sufficient priority. The court notes the fact that defendant originally asked for a sixty day period in its own request for a remand. Nevertheless, to avoid the possibility of an ill considered decision, the court extends the period of investigation to May 28, 1990, by which date defendant shall report its results on remand to the court. *No further extensions will be granted.* [Emphasis added].

---

[6] Labor had been directed to address the issue of whether train-stop kit manufacture was transferred domestically.

[7] These affidavits from a prior remand investigation are discussed *infra* p. 20.

Nevertheless, on May, 25, 1990, Labor filed a motion for a two week extension of time to submit its redetermination. While plaintiffs initially opposed the motion, they stated that they would have no objection provided that the court require Labor to consider the statements of Poremba, Fonzi, Fabrizi and Wilson. Labor opposed plaintiffs' request that the court require it to consider the statements. Alternatively, Labor cross-moved that if the court required it to consider the statements submitted by plaintiffs, that the Secretary be granted leave to investigate the allegations in the statements. Plaintiffs opposed Labor's cross-motion. The court granted Labor's motion for a two week extension and plaintiffs' request, ordering Labor to consider the affidavits.

After review of the administrative record, Mr. Marvin Fooks, Director of the Office of Trade Adjustment Assistance, recommended to the certifying officer that he issue a notice of negative determination on reconsideration. Confidential Supplemental Administrative Record at 61-65. The certifying officer followed the recommendation and, on June 11, 1990, issued a notice of negative determination on reconsideration. Supp. Ad. R. at 66-71.

The court would note that neither party followed the court's directions properly in all respects. Plaintiffs should have submitted affidavits in advance of the hearing. On the other hand, it is not clear that Labor afforded plaintiffs a clear opportunity to do so. Labor also was not justified in closing its hearing to testimony by plaintiffs' witnesses on the basis that it was forbidden by the court. Labor was perfectly free to allow plaintiffs to testify at the hearing and it should have done so if it intended to fully explore the remanded issues, as was its duty.

Requiring Labor to consider plaintiffs' post-hearing statements was intended to remedy Labor's rigid approach to the hearing. As for the request for further investigation, Labor had more than enough time to do a proper investigation.

With regard to "Mid-Tex relays," this issue was belatedly raised. It has never been the subject of the previous motions before the court and it is much too late to open up a new avenue of investigation. If Labor was negligent in investigating this area, that claim should have been made earlier.

## B. *L-Shaped Relay Frames:*

As indicated, in *United Electrical II* the court upheld Labor's determination that importation of Korean L-shaped relay frames did not contribute importantly to separations at the Swissvale plant. Plaintiffs ask the court to reconsider its decision.

As the court stated in *United Electrical II*, "[m]uch of the dispute revolves around a purchase order, dated March 17, 1986, in which the Company requested delivery of relay frames from a Korean producer.

B-537-39.[8] The Company requested that the first and smallest order be delivered on May 15, 1986. The rest of the order was to be delivered at other times in 1986 and 1987. *Id.*" 731 F. Supp. at 1087 (footnote added). The parties disputed whether or not the purchase order was ever executed according to its terms. The court found this dispute to be irrelevant because "the first documented delivery date, May, 1986, was beyond the time that the Secretary should have completed her investigation." Plaintiffs' Objections to Defendant's Decision (P. Brief) at 21. The court reasoned that because Congress mandated that the Secretary complete her investigation in no more than sixty days, 19 U.S.C. § 2273(a) (1982), and that plaintiffs filed their petition on January 17, 1986, that "[h]ad this investigation not been mired in error and dispute, the Secretary's final determination would have issued before Korean relay frames had even been ordered. * * * The fact that litigation ensued does not extend the relevant time frame." 731 F. Supp. at 1089.

Plaintiffs contend that "the 60 day period within which Labor is supposed to complete its investigation is not a bar to consideration of the imported L-shaped relay frames." P. Brief at 21. They correctly point out, as the court did at length in *United Electrical II*, that Congress intended to ease qualifying criteria so that more workers would be certified than had been under the Trade Expansion Act of 1962. Plaintiffs point out that they

> first filed for certification on January 17, 1986. Labor, however, did not issue its *first* decision until August 4, 1986, well beyond the sixty day period. After Petitioners appealed the first decision, *Labor* acknowledged that it had not properly investigated the case and requested a remand. It did not issue a revised decision until May 1987. Two more decisions, each preceded by its own investigation have since followed. In the course of each [of] these investigations Labor gathered and considered evidence on import activity in 1984, 1985 and 1986. It then found that (other than the three certified sections) Plaintiffs had failed to demonstrate an increase in imports in either 1985 or 1986. (E.g. A-54, C-192). Under the facts of this case, Labor's use of 1986 was plainly a reasonable exercise of its discretion.

P. Brief at 22-23. [Emphasis as set forth in original, footnotes omitted]. Plaintiffs further contend that they "do not maintain that Labor must continue to investigate each petition indefinitely merely because litigation ensues. However, where, as here, it was Labor that caused the delay, there is no reason why its decision should not encompass the period actually investigated." P. Brief at 23.

The court agrees that Labor exercised proper discretion in examining data from 1986. In conducting investigations, administrative agencies "consistently examine[ ] periods surrounding the POI[9] in order to understand the significance of activity within the POI." *Kerr-McGee*

---

[8] The prefix "B-" refers to purchase orders in the administrative record.

[9] "Period of Investigation."

*Chemical Corp. v. United States*, 14 CIT 344, 739 F. Supp. 613, 626 (1990) (footnote added). Moreover, it may very well be proper for Labor to certify workers separated from, or threatened with separation from, employment due to imports ordered after the filing of the petition or even more than sixty days thereafter. The court does not believe, however, that the Secretary is obligated to do so as a general rule. Plaintiffs argue that "[e]xcluding 1986 from the scope of the investigation would have required Petitioners to file a new petition every sixty (60) days, even though they were in the midst of a legitimate, ongoing investigation which encompassed that year." P. Brief at 24. Such is not the case. Since the impact date of an investigation is a year prior to the petition date, 19 U.S.C. § 2273(b)(1) (1982), petition filed any time up to January 17, 1987, would have left no period during 1986 uninvestigated. Based on this record, the court does not find error in lack of certification based on imports first scheduled to arrive in May 1986.

Plaintiffs also fault Labor for refusing to investigate possible importation of Korean relay frames during the POI. P. Brief at 24. Assuming *arguendo* that it should consider the matter, which was not a subject of the remand order, the court does not believe that the evidence at the third investigation hearing, *see* Hearing Transcript (H-) at 52, 104-109 is sufficient to alter *United Electrical II*'s finding "that Labor's negative determination regarding importation of Korean relay frames is supported by substantial evidence in the record." 731 F. Supp. at 1089.[10]

## C. *Italian Train-Stop Kits:*

Labor reaffirms its negative determination regarding the effect on employment of importation of Italian train-stop kits. Supp. Ad. R. at 68-69. Plaintiffs contend that the Secretary's decision is not supported by substantial evidence in the record. P. Brief at 15-20.

Evidence in the record compiled by Labor in the most recent remand investigation demonstrates that Swissvale did not produce the kind of system ordered from an Italian affiliate, and that this order allowed the Company to get a contract of which the train-stop order represented only five percent of the dollar value. Supp. Ad. R. at 10-11, 14, H-14-20, H-36-37, H-49, H-88-90.

Plaintiffs admit that "the Italian order was for an older, less sophisticated type of trainstop than was normally made in Swissvale." P. Brief at 16. They point out, however, that the record indicates that Swissvale had the capability of producing such a system, and that development would not have been necessary since the Company could have transferred the capability from the related Italian facility to Swissvale. There is also evidence in the record, however, that both development and transfer were either uneconomical or unfeasible. H-23-24.

---

[10] The hearing at most indicates *unsuccessful* outsourcing *attempts* with regard to Korean Relay Frames.

The court notes that the rationale for Labor's current factual determination regarding train-stop kits bears little relationship to its previous "domestic transfer" theory. The current theory is that the Italian train-stops were not substitutable for Swissvale-produced train-stops and, therefore, they did not cause or threaten layoffs. Labor does adhere to its view that the "one-time order" did not affect the plant.

Substitutability and the one-time order approaches focus on imports to the Swissvale plant. These approaches ignore the broad question of the impact of importations into the American market of train-stops that were in competition with those made at Swissvale. Perfect substitutability under contract specifications is not necessary to a finding that products compete or that increased imports of such competing goods caused or threatened layoffs. If users specified a competing type of imported trainstop rather than a domestic type, thus significantly contributing to employment declines at Swissvale, certification should have occurred.

### D. *Canadian Office Control Panels:*

Labor reaffirms its determination that importation of Canadian office control panels did not contribute importantly to worker separation at Swissvale except in departments 390, 222 and 110. Supp. Ad. R. at 67-68. The Secretary's decision here is unacceptable.

According to the certifying officer, "[d]uring the investigation, the company officials were focusing on the big picture—$137 million a year in business. Panel imports were infinitesimal (less than one-half of one percent) at $300,000." Supp. Ad. R. at 67. It is unclear if the officer meant this as a reason why imported panels were not a basis for a larger certification, or if the officer meant merely to explain why Company officials did not originally acknowledge that Union Switch used imports. In any case, the $300,000 figure bears no relation to any data involving production at Swissvale, and it may not be considered. The figure is derived from handwritten figures on blank sheets of paper which do not appear to be regular business documents. At the hearing, Mr. Kopsa stated that he did not know how this figure was derived. The figure is also contradicted by testimony as to import impact and by Labor's certification of three sections of the plant based on imported panels. Apart from inherent nonreliability, the figures are simply a substitute for testimonial evidence of the kind upon which the court, because of past error, instructed Labor not to rely unless the author of the statement appeared at the hearing. 731 F. Supp. at 1094. Therefore, the figure may not be accepted as an indication of the value or quantity of imported office panels affecting the Swissvale plant.

Another reason for Labor's denial of expanded certification seems to be continued reliance on a process sheet for a small "B-30" panel as opposed to a large office control panel which is the important panel at issue. Labor now claims that the certifying officer was merely explaining the rationale of the former investigations. The certifying officer, how-

ever, seems to refer to the determination at bar: "This *is* based on the process sheet and testimony." Supp. Ad. R. at 67 [emphasis added].

In addition, it appears that the testimony to which the certifying officer refers is that of Mr. Poremba, who testified that he could recall only one imported panel, that it was to fill an order for kind of panel not produced at Swissvale, and that Swissvale performed most of the work on it in any case. The court cannot understand, if this represents the panel imports from Canada, why Labor certified any sections at Swissvale. As it appears that Labor continues to stand by its determination that imports of Canadian panels caused separations in three sections of the plant, Supp. Ad. R. at 67, this one panel cannot represent the whole picture.

Mr. Poremba's earlier affidavit indicated that in the one imported panel that he recalled, much of the value was added at Swissvale. Supp. Ad. R. at 9-10. His oral testimony at the court ordered hearing held on May 23, 1990, indicates that the specifications for the outer shell of the particular panel required technology unavailable at Swissvale. H-60-62. His later affidavit indicates that panel production involved many sections of the plant, and that there may have been more imported panels than the one that he remembered. Supp. Ad. R. at 59-60. The certifying officer states that "[s]ince the subsequent affidavit by Mr. Poremba does not explicitly or directly contradict his earlier affidavit and oral testimony, I accept Mr. Poremba's earlier affidavit and oral testimony as persuasive." Supp. Ad. R. at 68.

Apparently the certifying officer reads Mr. Poremba's testimony as indicating that jobs were not lost at Swissvale due to imported panels because of the further work that the panels required when they arrived at Swissvale. This reading conflicts with the testimony of Messrs. Louis Serrepere and James Phelan, former management employees who worked under Mr. Poremba, whose affidavits he reviewed. Mr. Poremba stated that "[t]o the extent that I have direct knowledge of the facts and issues addressed therein, these statements appear to be true and correct to me." Supp. Ad. R. at 60. According to Mr. Phelan, imported panels eliminated nearly 20% of the jobs in Unit Shop II, reduced the workload of the Quality Assurance section by one third, and significantly reduced the workload of other sections, such as storeroom. C-72-73.[11] Mr. Serrepere testified that panel imports eliminated jobs in Unit Shop III. C-79. Given Mr. Poremba's statement that these men "would have been more directly involved on a day to day basis with those respective areas than I was * * *" and that "[e]ach of these men, in my opinion, is a person of integrity, with a reputation for honesty," Supp. Ad. R. at 60, the court cannot understand how the certifying officer finds no contradic-

---

[11] Mr. Phelan's testimony as to the reduction of the work in the storeroom is backed up by other evidence in the record. C-59. The court also notes testimony that imported panels caused half the drafting section at Swissvale to be laid off. C-49-54. While some of the information in the record is not time specific, data throughout the various investigations indicate that job reductions occurred from 1983 through 1986 due to imports.

tion between its apparent reading of Mr. Poremba's pre-Hearing affidavit and Hearing testimony, and his post-Hearing affidavit. Moreover, the certifying officer's apparent reading of Mr. Poremba's testimony conflicts with the post-Hearing affidavits of Messrs. Bruce Wilson, James Fonzi and John Fabrizi, who testified that the imported panels came into Swissvale with the wiring and component parts, which used to be made at Swissvale, already in place, and that these imports eliminated twenty percent of the jobs throughout the plant. Supp. Ad. R. at 56-58.

The court rejects as unsupported the certifying officer's apparent conclusion that the particular panel about which Mr. Poremba testified is representative of Swissvale panel imports. Mr. Poremba testified about the only Canadian panel that he recalled; he did not claim that this was the only imported panel. Supp. Ad. R. at 60. Mr. Fabrizi claimed to have worked on over twenty panels which came with all the component parts already manufactured. Supp. Ad. R. at 58. *See also* Mr. Fabrizi's testimony at C-49-51. In the first court-ordered hearing held on April 16, 1987, Mr. Bruce Wilson testified that initially the Canadian panels required much work at Swissvale, but that they later came into Swissvale as a finished product and were eventually shipped to customers directly from Canada. Transcript at 40. *See also* Mr. Fabrizi's testimony at the 1987 hearing, Transcript at 42-68. It appears that Mr. Poremba, who did not work as closely with panels as did plaintiffs' affiants and was not actively employed at Union Switch during the latter half of the POI, recalls one of the early imports.

It may be that the certifying officer reads Mr. Poremba's testimony as indicating that the kind of panels imported from Canada, which apparently used a kind of outer shell not produced at Swissvale, did not compete with Swissvale's product. Mr. Poremba himself testified, however, that much engineering and testing, which Swissvale was fully capable of performing, remained to be done after the panel arrived. If jobs were lost because this work was later performed in Canada, then these workers should be certified. Moreover, Labor apparently has already found competition between imported Canadian panels and those made at Swissvale, because it certified the Swissvale sections involved in sheet metal fabrication and plating.[12]

According to the Director of the Office of Trade Adjustment Assistance,

> [i]nvestigation findings show that the need for the restructuring of the Swissvale plant came from an inefficient Swissvale plant, the need for a more favorable labor climate, * * * and from flat domestic and export markets, * * * resulting, in part, from lower federal spending for transit programs * * * The Swissvale shutdown was the result of 1) outsourcing to partner vendors of feeder operations

---

[12] As with train-stops, Labor made no finding of lack of *competition* between the foreign product and the Swissvale product.

such as machining, sheet metal, plating and heat treat; 2) the transfer of ground equipment assembly and test to Georgia; 3) the transfer of relay assembly and test to South Carolina and 4) the establishment of a new product service and distribution center in Georgia.

Supp. Ad. R. at 63 (citations omitted). Some of these conclusions are suspect. In any case, while there may have been other reasons, besides imports, for layoffs at Swissvale, petitioners should be certified if increases of imports "contributed importantly" to worker separations during the investigatory period. 19 U.S.C. § 2272(a)(3) (1988). For the purposes of part (3) of this statute both at the time the petition was brought and presently as amended, " 'contributed importantly' means a cause which is important but not necessarily more important than any other cause." 19 U.S.C. § 2272(b)(1) (1988).

Were this simply a matter of the weighing of competent and relevant conflicting testimony and assessing its credibility, the court would uphold Labor's determination. The problem, however, is not Mr. Poremba's credibility. What troubles the court, rather, is the certifying officer's expansive and seemingly unjustified reading of his testimony.

Perhaps most troubling is that Labor does not seem to have considered the statements submitted by plaintiffs after the hearing, despite the court's order that it do so. The Secretary has given them no weight, despite the fact that no specific evidence in the last remand investigation appears to contradict them particularly with regard to Canadian office panels.[13]

We note that "[t]he judiciary can scarcely perform its assigned function, limited though it is, without some indication not only of what evidence was credited, but also whether other evidence was rejected rather than simply ignored." *Brown v. Bowen*, 794 F.2d 703, 708 (D.C. Cir. 1986) (citation omitted). Perhaps the Secretary gives the affidavits no weight because they were not sworn. As the court indicated, Labor was ordered to consider them as a remedial measure, not because they were otherwise acceptable. Considering that Labor does a great deal of its investigation by means of telephone inquiry and unsworn submissions, lack of oath cannot be a irremediable barrier to consideration.[14]

Mr. Poremba's testimony is either supportive of certification or incompetent because of lack of direct knowledge. As this court has indicated, "[s]tatements * * * that are inconsistent, uncorroborated, *not entirely based on personal knowledge*, and possibly biased do not constitute substantial evidence."[15] *Former Employees of Tyco Toys v. Brock*, Slip Op. 88-114 at 4 (CIT August 26, 1988) [emphasis added]. Mr. Kopsa

---

[13] The court does not consider Mr. Kopsa's general conclusions, unsupported by specific data, about lack of employment declines due to imports as substantial evidence.

[14] The court may award benefits if the agency does not explain its refusal to credit relevant testimony. *See Ghazibayat v. Schweiker*, 554 F. Supp. 1005 (SDNY 1983) (disability benefits awarded by court after administrative law judge had not explained his refusal to credit testimony of plaintiff and his physicians regarding plaintiff's pain).

[15] The court makes no finding of bias.

and Mr. Poremba should not be consulted anew. If Labor has some reason to disbelieve plaintiffs' affiants it certainly has not made this clear except by vague references to inconsistencies and lack of detailed data. Labor, however, failed during earlier investigation to follow up with plaintiffs' affiants and to seek more detailed information. Labor, as investigator, was required to do this. If specific detail is lacking, Labor must bear the responsibility.

To avoid any questions as to the sincerity and accuracy of the new statements submitted by plaintiffs, plaintiffs are directed to provide new affidavits, except from Mr. Poremba. They are to be sworn and are to contain time-specific information, if the affiants can recall such information. If the affidavits continue to support certification, Labor is to certify the Quality Assurance section.[16] These statements, together with those of Mr. Phelan and Mr. Poremba, along with other record evidence, support the conclusion that imports contributed importantly to layoffs in this section. There is no substantial evidence to the contrary. Labor may not investigate endlessly in an effort to gather such information.

Labor shall then concentrate on determining which other sections of the plant should be certified. If distinctions cannot be drawn because of loss of records and witnesses cannot remember exact times of layoffs in various sections, the entire plant must be certified because Labor is responsible for the delays and loss of records.[17]

Labor has thirty days to complete this investigation. If it has plans for investigation beyond obtaining sworn statements as directed by the court it must request court permission to proceed. As soon as the investigation is complete the court will review the result. Labor has again failed in its duty to investigate fairly. If the entire plant is not certified based on Canadian office panels, Labor shall then turn its attention to train-stops and determine if increased imports of competing train-stops to the American market in general, as well as to Union Switch, contributed importantly to employment declines at Swissvale.

At this point in time, it is highly unlikely that a true picture of the impact of imports on employment at Swissvale will ever be known. It may be that more workers will be certified as eligible than should have been if the proper documentary evidence was obtained and the proper avenue of investigation followed at the outset. But plaintiffs may not be penalized because of Labor's initial errors and easy grasp of erroneous data indicating lack of eligibility.

---

[16] The fact that layoffs were recorded in QA in May 1986 supports the conclusion that they were threatened earlier. Labor did not do any investigation which would support the contrary view.

[17] The court notes the numerous other sworn affidavits and testimony in the record which also support plaintiffs' position on this issue.